Here are the next case in the calendar, Chai v. Commissioner of Internal Revenue. Morning, Your Honors. Morning. May it please the Court, Jeremy Klausner for Appellant Jason Chai. Chai, I'm sorry, mispronounced. Quite all right. So the Appellant's here on two issues today from a decision in the United States Tax Court. The first issue is whether some money that he received back in 2003 was received as a result of his being in a trader business. And the second issue is an issue that the Tax Court declined to address, which was whether the Commissioner satisfied his burden of production on the issue of whether Mr. Chai is liable for a penalty on the underpayment of tax. With respect to the first issue, Trader Business Don't we also have a question about the jurisdictional ruling, or we'll deal with that separately? That's on the cross-pillar, Your Honor. We do concede, though, that it is ordinary income, the $2 million. We do concede at this point that the $2 million is includable in income, yes, Your Honor. Great concession since you don't have to pay any tax on it according to the Tax Court's ruling, right? Well, Mr. Chai's 2003 return was oversheltered. However, it is the subject of a separate proceeding in the United States Tax Court. So just to get to the end first, with respect to the cross appeal, the government did issue a notice of deficiency with respect to that related case, the Mercado case, so that Mr. Chai is now, again, in tax court on that very issue and that's being litigated. Actually, that case has basically been stayed pending this appeal because it may directly impact the outcome of that case. Right. Go ahead. So with respect to the first issue, which is whether or not Mr. Chai was engaged in a trader business, we posit that the Tax Court completely misconstrued the guiding principles which are under the Grotzinger case. And in the first instance, if I could just step back, the findings of fact that the Tax Court reached indicated that Mr. Chai was actually an employee of this umbrella of entities, these bricolage entities. I was a little confused about how you could be an employee of several different entities without anyone being the employer. He got 1099s. Did he get it? He got a W-2 maybe in some cases? He did get a W-2, Judge. He got 1099s and this payment was made by Delta, right, which had issued a 1099. They had a discussion about it and he was informed that that's what they were going to do. So he didn't receive it as an employee, did he? Well, so- The $2 million in 2003. What the evidence at the trial showed, and it's in the record, is that the architect of these tax shelter schemes, Andrew Beer, was the owner and the principal of basically three separate entities. One was called bricolage, one was called counterpoint capital, and the third one, as you mentioned, Your Honor, is the Delta currency trading. And they each basically served the same function, but they sort of differed in the types of clients that they advised. Wasn't your initial petition to the tax court, didn't you say that he was not an employee of Delta? He was not an employee of Delta. No. But now you're saying that he wasn't, in fact, an employee of Delta. No. What I'm saying is that the tax court in its findings of fact determined, and the tax court used this bricolage umbrella because what came out is that Mr. Beer didn't care where the money came from. He didn't care if it came from bricolage. He didn't care if it came from counterpoint. He didn't care if it came from Delta. And, in fact, there were e-mails that said, do we have enough money in Delta to pay? But he never received a salary from Delta. Never received a salary from Delta directly. But getting back to sort of trader business, he was in this, wasn't he, in a continuous and regular way and motivated by profit. He set up a company to help him deal with some of these burdens. Profit was what motivated him, right? Judge, I'm glad you asked the question that way. So if I could answer the first part of the question first, which is the continuity and regularity, which is one of the factors you look at under Grotzinger. If we look at Grotzinger itself, that was a case involving a professional gambler. And, interestingly, of course, in that case, the commissioner took the opposite position. It wasn't a trader business because they didn't want him, the taxpayer, to be able to deduct his expenses. So if we look at the facts there, the taxpayer gambled six days a week, an average of 50 to 60 hours, I think the case said, a week, 48 weeks a year. I did the math, and it works out to be about 2,800 hours per year that he was engaged in this activity. The evidence in this case is that Mr. Che went to Bricolage's offices approximately six times for about an hour and a half each time, a total of, we'll go with nine or ten hours, to sign documents that he didn't prepare, that he didn't come up with for entities that he did not create. He made much more doing that, didn't he, than he did as an architect? If you look at 2000, his income from architecture was $56,000. In 2001, it was $11,640. If you compare that with what he was getting with respect to these various enterprises, it's just dwarfed. His profit, his desire to make money, is clearly what animates him. Well, that was a point I was also going to address, and I'm glad you asked the question that way, too. If we look at, there's an interesting case, which is Levinson v. Commissioner. Now, in that case, the taxpayer was, he had a retail store, and he sold electronic goods. And in his part time, he was an inventor, and he invented and patented a microwave container. And the patent on the microwave container was infringed by two separate entities, and the taxpayer maintained two patent infringement suits. And one he settled for approximately $500,000, and the other he settled for over $200,000. So he received $750,000 in income from the microwave container, and the tax court still held that it was not a trader business, because his activity was too sporadic and very key to these cases, because the taxpayer had other full-time employment, just as Mr. Che did. He was a full-time architect. If we look at some of the other cases that discuss profit motive, they do discuss this concept of other full-time employment, just as in Levinson. It's a recurring theme. In Grossinger, for example, the taxpayer was a professional gambler. He had no other full-time employment. But he did take certain capital losses for disposition of business property himself, didn't he, on his return? And didn't he also do something as an offsetting mark measure with regard to some of his income? He marked to market his election with regard to certain income that he received? Those positions were certainly taken on his returns. So he himself viewed some of his activity as a business or trade, didn't he? According to the returns, yes. He signed them, didn't he? I always think about that when my sister-in-law hands me my return. I'm signing them. I think of myself, what's in here? But he signed them. Judge, absolutely. I was sitting in the back earlier, and I'm saying I hope Judge Wesley doesn't ask me any questions. He's asking the hard questions today. But, yes, Mr. Che absolutely signed the returns. But, again, if we look at the reality and the totality of the situation, those returns were prepared by Grant Thornton, which was an accounting firm that was hired by Mr. Beer and Mr. Beer's entities. Those returns were extraordinarily complex. His business was signing these documents to be this depositor, this pass-through entity, to help his newly acquired cousin-in-law, I guess, to have this business that provided huge hedges and shelters for people with large amounts of income. It was extraordinarily successful. Mr. Beer must have been very creative because your client got a $1.2 million signing bonus to just sign. I mean, his signature was worth a lot. The job that he did was easy, really easy. I mean, this is the kind of job all of us want. He gets paid $100,000 a year just to sign things. And, in fact, he even, as Judge Kasman points out, it kind of crimps his business with his architecture, so he sets up a business that does the signing for him. Again, Judge, those are the facts. However, if we look at the real estate, I own a ton of real estate. I own a ton of real estate. I'm not going to make an analog to somebody who lives on Fifth Avenue. I own a ton of real estate, and I have a legion of people that go out and appraise the properties for me, and they talk to the bankers, and they develop with architects all the plans and everything, and all I've got to do is show up and sign the deed. My job is to just sign the deed. I'm in the business of real estate development, aren't I? Judge, I think you're putting Mr. Che in the position of Mr. Beer. I'm in the business of providing hundreds of billions of dollars of tax write-offs to investors who have income that they don't want to pay income tax on. That's his business. Our position is that that just doesn't qualify. It doesn't sound like a hobby to me. What Mr. Che did, I think you're equating what Mr. Che did with what Mr. Beer did. Okay. Mr. Che was just the accommodating party. He was a necessary element, was he not? That is a necessary element. Granted, that's a necessary element to the tax shelter, the POPs and the PICO schemes that Mr. Beer came up with. There's no question about it. As I'm sure Your Honor understands, the client gets the loss leg and the accommodating party gets the gain leg. I don't completely get it, but I get it enough, I guess. It just doesn't rise to the level, the continuity and the regularity of the conduct. It just doesn't rise to the level of some of these other cases, if I could point to the Bagley case. Here's a case where the taxpayer prosecuted some key TAM actions under the False Claims Act. Again, the commissioner took the position, not a trade or business, because he had a $9 million legal bill in prosecuting these cases, and he wanted to deduct it from, I think, the $27 million that he earned. Would you mind if I tried to move you to the last piece? Sure, Judge. The inadequacy of the government's case with regard to the signature on the document is required by the statutes. Okay, so the 6751B issue. When did you move against it? Did you move against it at the close of the government's case? It was in our post-trial briefs. But it was post-trial, so it wasn't post-closure of the government's case. It was at the completion of the submission of evidence? It was at the completion of the submission of evidence. Both sides. Both sides, correct. So the tax court works that way. You try the case, and then the tax court has post-trial briefing, and then a decision is rendered. Could you have moved at the close of the government's case, pointing out that they had failed to meet the statutory requirement for the signature? We certainly could have done that, but it's generally done in the post-trial briefs. The argument is made in the post-trial briefs rather than making a post-trial motion. That's how the tax court generally operates. But the tax court said you'd waived it. Well, the tax court declined to address the issue. They said we didn't raise it before the trial. And the issue with that is there's no way to raise the failure to meet the burden of production before they actually meet the burden of production. We had a trial, and they could have come forward with the evidence at trial of the ---- How was the penalty first imposed, though? Wasn't there any prior communication saying here's the deficiency, here's the penalty? Well, so generally what happens is that some employee of the Internal Revenue Service determines to impose the penalty. The taxpayer has the opportunity to contest that in this case. It was argued that the penalty should not be applied based on reasonable cause. The IRS employee reviewed that opposition to the penalty, determined that reasonable cause was not applicable, and determined to assess the penalty. And that was included in the Notice of Deficiency, which gave Mr. Che his tax court rights, as well as the attachment to the Notice of Deficiency, which is called the Explanation of Items. It's the Form 886A. So this ---- Your position would be that that was invalid imposition of a penalty because you had not been presented with the signature approving the imposition of the penalty. At that point, no. The Commissioner of the Internal Revenue Service is not required to furnish the taxpayer with evidence of compliance with 6751B1 at that point. Why do you say that? I mean, the statute says they can't impose the penalty absent the written approval of the supervisor, right? Yes. That is what the statute says. But in the examination phase, the IRS is not required to provide the taxpayer with that document, so to speak. So it's not until there's a kind of final resolution of the matter, you're saying? When payment becomes ---- It's not until the Commissioner fails his burden of production at trial to come forward so that under ---- I love numbers. 6701D ---- No, I'm sorry. That's the 1099 issue. Under ---- 6751? No. The Commissioner has the burden of production with respect to the imposition of a penalty under 7491C. Now, part of that, the elements of the claim for a penalty, one of the elements is 6751B. You have to have the written approval of the supervisor, of the employee who first determined to assess that penalty. It's an element of the claim. I don't know how you can argue they didn't satisfy the elements of their claim until they don't satisfy the elements of their claim. That would be like saying that if I were the plaintiff in a negligence case, that my adversary would be required before the trial even began to tell me that I had to prove duty, breach, causation, and damages. That just is not how our jurisprudence works. It's an adversary proceeding. I don't have to tell him what the elements of his claim are, and he doesn't have to tell me what the elements of my claim are. When you return on rebuttal, we'll also ask you some questions about jurisdiction as you deal with it in the reply brief. But I guess first we should hear the cross-examination. Thank you very much. Thank you. Thank you. May it please the Court. I'm Arthur Catterall of the Justice Department on behalf of the Commissioner, and I will also reserve a couple of minutes for rebuttal on our cross-appeal. First, let me reiterate what Judge Wesley pointed out, and that is if this Court accepts our jurisdictional argument, then the taxpayer will owe income tax on the $2 million payment regardless of the outcome of his own appeal. So let me get to the jurisdictional argument. And I realize that all this technical jargon about partnership items and affected items is enough to make your eyes glaze over. But on a conceptual level, the jurisdictional issue is not that difficult. The results of the Mercado partnership proceeding became final while the taxpayer's tax court case was still ongoing. And everyone agrees that the proper means of applying the results of the Mercado proceeding to the taxpayer's return is through what is called a computational adjustment. And all that means is that the IRS adds back the $11.1 million loss that the taxpayer claimed through Mercado. And if doing so, if doing that results in additional income tax, then the IRS assesses that amount, making it immediately collectible, without first having to give the taxpayer the opportunity to dispute the additional amount in the tax court. Your adversary says that you essentially have two options, as I understand it. Either the results, if the results are purely computational, then you have to issue a notice of computational adjustment. Or if they're not purely computational, you have to go through the standard deficiency procedure. And you're saying that neither is true here. No, we're saying that applying the results of the Mercado proceeding to the taxpayer's return was purely computational. That was a purely computational exercise. And the IRS performed that exercise. What it did is it took the income figure that the taxpayer reported on his return, which was about negative $11.5 million, and then the IRS added back about $400,000 to reflect an agreed-upon adjustment relating to a loss from another year carried forward. And then added back the roughly $11.1 million loss that the taxpayer claimed through Mercado. And as the round numbers suggest, the result was close to breakeven. About $50,000 of taxable income resulting in about $10,000 of income tax. That's the amount, the $10,000, that was outside of the tax court's jurisdiction. And the IRS assessed that amount, as it was entitled to, rather than asserting a claim for it in the taxpayer's ongoing tax court case. So then you say, okay, so what was the effect of this mechanical exercise on the taxpayer's ongoing tax court case? Before the results of the Mercado proceeding became final, the dispute over this $2 million payment from Delta did not give the IRS a claim to additional income tax. Because even if the $2 million were fully taxable, the — The Mercado deductions, if the deductions were good, if the losses were good. Right. Exactly. The IRS had to give effect to that claimed partnership loss. So even if the $2 million were fully taxable, the inclusion of that amount in the taxpayer's income would simply have reduced his claimed loss by $2 million. It wouldn't have resulted in positive income. But once the results of the Mercado partnership proceeding became final, now the IRS no longer has to give effect to this $11.1 million loss that the taxpayer claimed through Mercado. And now the ongoing dispute over the taxability of this $2 million payment — Go ahead and finish your statement. — does give the IRS a claim to additional income tax. Can I stop you there for a second? Sure. Because we don't see a lot of tax cases. And so I want to be very careful because I don't want to end up deciding something that bollocks us up a system that you folks understand a lot better than we do. But he didn't list the $2 million on his return. Correct. So you can't just add it on. You have to get it from someplace, and you have to figure out that it's income. Now he's conceded from us that if it were added on, it's income. But you have to get it from someplace, don't you? When you say get it from — Well, you didn't have the $2 million on. You would be right. I would think you'd be right that if the $2 million showed up, but he had offset it against all the Mercado losses, then you say, okay, once the Mercado losses are all thrown into a hat and said they're bogus, they're no good, then you look at his return, and he's got $2 million there that's no longer protected, right? Right. That sounds computational to me. Right. But when he didn't report that on his return, you have to do something more than just a computation. You have to understand what the $2 million is, don't you? And that is his — that's the whole basis of his separate tax court proceeding. The IRS audited the taxpayer, discovered this $2 million payment, and asserted the deficiency in self-employment tax. It couldn't assert a deficiency in income tax because the partnership loss offsets the $2 million for purposes of income tax, but not — Not for self-employment? Exactly. Oh. Exactly. So what you're saying, as I understand it, is that — is really to ask ourselves, at what other point — Exactly. — did the IRS have assessed the ordinary income taxes on $2 million? It couldn't have done so at the initial notice of deficiency. Right. Exactly. It couldn't have done so before the Mercado proceeding — Correct. — was complete, and it couldn't have done so through a notice of computational adjustment. Correct. So if you think about it in those terms, then the question is, well, when could they have done it? Exactly. And you had a statute of limitations problem, too, to deal with, didn't you? I mean, that the — you had to — Right. — make — and I wondered about whether you could have procured some kind of extension, either negotiated with the taxpayer — I don't — I mean, oftentimes that is the case, but you raise a valid point. I mean, the IRS can't just — you know, when the IRS discovers this $2 million payment, it can't just say, okay, we're going to wait until the end of the partnership proceeding, and then we'll issue a notice of deficiency. You're exactly right. There's a statute of limitations problem. But that struck me as kind of a structural problem in terms of integrating the TEFRA proceedings  And there is a special procedure that deals with this problem. And the only — it didn't apply in this case because of this little self-employment issue. In order for — there is a special procedure, and I believe it's Section 6234. But in order for that to apply, there can't be a deficiency in tax, even taking into account the partnership loss. But here, even taking into account the partnership loss, there was a deficiency in self-employment tax. That's why the IRS couldn't use Section 6234. Ordinarily, there is an integration. Yes. But this, because of the self-employment tax, was not eligible for that. Yes. Isn't there something that's even a tighter fit for you? And that's 6230A2A. Wasn't this really an affected item that required a partnership-level determination? You had to determine whether the Mercado losses were legitimate or not. I presume it was a K-1, right? Yes. I mean, it was a partnership return. So you had to determine whether they were legitimate or not. Once you determined that they were no longer legitimate, that determination, that significantly impacts — you were okay in assessing the self-employment tax against the $2 million because, as you pointed out now, I didn't get that before. You didn't have to pay income tax on it because it was protected by all the losses, but you still had to pay self-employment tax. Okay. But doesn't that then jurisdictionally fit much cleaner than calling it a computational error because of the difference between the self-employment tax and the income tax liability? Well, I mean, and that's our alternative argument, and I just, you know, I don't think it's as technically strong. I mean, the tax court phrase that accounts this in terms of whether the additional deficiency was an affected item, and that's wrong. That's just wrong. It's made wrong because of the fact that you'd already assessed the self-employment tax against it as an additional deficiency? No, it's made wrong. It's technically wrong because the statute talks about deficiencies that are attributable to affected items. The deficiency itself is not an affected item. Oh. So our alternative argument is that the $2 million payment is an affected item, but that's — I mean, that's kind of a strain as well because the $2 million payment has — Losses. — has nothing to do with the merits of the Mercado partnership proceeding. It's two completely different — so, you know, we did make that argument, and, you know, maybe that appeals to you more so than the primary argument. I'm just saying that it's technically iffy. Can I ask you something about the question of whether there has to be approval in writing by a supervisor? Sure. And let me — can I just interject quickly and confess some error? That's what I'm trying to — okay, well, if you want to confess, go ahead. Right. Counsel is absolutely correct that a substantial understatement penalty, even though it's purely computational, is subject to this section 6751B requirement if the taxpayer raises a reasonable cause defense in response to the initial determination. We suggested otherwise in our brief, and I apologize for the error. My confusion really was that in the simultaneous answering brief to the tax court, you said exactly what you just said, and it seemed that the brief was a departure from a prior position. And that's my mistake. So just to be clear — So it is a prerequisite, a statutory prerequisite — Yes. The 6751B, and as I understand it, and the way this usually works, the IRS sends out a 30-day letter, what they call a 30-day letter, and says we're proposing to make these adjustments, and then the taxpayer responds, files a protest or what have you. And it's my understanding — I don't know completely what happened, but it's my understanding that they did raise the reasonable cause defense, and certainly at that point it's no longer just a mechanical determination. And we — Since it's statutory, why is it waivable? Well, I mean, I don't know. When I think of things not being waivable, I think of jurisdictional items, but — Well, still, I mean, the statute says to impose the penalty, you have to have a reasonable right. And there's some question as to when is the proper time to — or, you know, when does the duty kick in? To present the approval, the written approval? Well, to make the — and to make the claim. I mean, usually taxpayers make these claims after the tax has already been assessed. And so what they are asking the IRS to do is to abate that prior assessment. There's some question as to exactly, you know, if you can even raise this in the tax court. There's a case called Legg, L-E-G-G, v. Commissioner, 145 T.C. 344, where the IRS, I believe, takes the position that the 6751B issue is not even properly before — the time to raise it is if the IRS makes the assessment and didn't obtain the approval, then you ask the IRS to abate the tax. In a nutshell, what is the consequence of, if any, of the error which you are now conceding? Well — What is the consequence for us? I don't think there's any consequence because the overarching issue is whether the tax court abused its discretion in declining to consider this argument. What I'm saying is that, as a substantive matter, in general, Section 6751B — So we don't have to reach whether it's error or not. Correct. The issue is whether the tax court abused its discretion. If it's an error of law, if the tax court misconceived what the statutory prerequisite was for the imposition of the penalty, that would constitute an abuse of discretion, wouldn't it? I mean, if — you know, I mean, the tax court was talking about you need to raise this before or during the trial. You can't raise it afterwards. And, I mean, that's one question I have. I'm not — I think your adversary points out that you can't know whether the government has failed to present — Sure. Why don't you just, in discovery, just say, show me the signature? Well, because it's part of your case in chief. It's the burden is on the government to present everything it needs to. Well, I guess what I'm saying is that, I mean, if a Section 6751B violation negates the applicability of the penalty, then it would seemingly be the case, regardless whether it is part of the IRS's burden of production. I mean — So any error would be harmless because the propriety of the penalty was subject to court review. Isn't that what you're saying? Exactly. Right, right. And what I'm saying is you don't have to reach that issue on — You don't have to reach it, but if you did, you could say what you're saying would be harmless error because the propriety of the penalty was subject to court review. So you're — okay. If you reach the issue, so if you decide that the tax court — well, then, okay. So if you reach the issue, then I think the issue becomes, you know, when does the taxpayer — I mean, is it part of the IRS's burden of production? And I would think if it is, you know, then we have a problem. But, again, it seems to me that there's nothing that prevents a taxpayer from raising this issue, you know, before the close of the IRS's case. And, again, I don't know exactly how the tax court procedure works, but that was one of my thoughts was why didn't they just — you know, when the IRS closed its case, why didn't they just make a motion right there? Now, counsel represents that that's not how — the way things are done, and he's in the tax court a lot. I'm never in the tax court. So I don't know the exact procedure of how that works. Thank you. Sure. Thank you. So with respect to the jurisdiction issue on the increased deficiency, strangely, I agree with almost everything that Mr. Catterall said and the computations that Your Honor made. However, the statutory scheme on how the TEFRA — the results of a TEFRA proceeding are imposed upon the individual partners is pretty clear. And there are two avenues. I even — I drew a picture to remind myself. It's like a flow chart. So here you have the partnership item at the top, and now that's been determined in the TEFRA proceeding. There are two ways to now translate that. Something else has to be done to take it from the partnership level to the partner level. And there are two avenues to get there. One avenue is a computational adjustment. When it's a purely computational matter, the IRS issues a notice of computational adjustment. And what happens is if the taxpayer wants to challenge that, there are no tax court rights because there's no deficiency jurisdiction for the computational adjustment under 6230. It limits the tax court's deficiency jurisdiction. So what you have to do is pay the tax and then sue for a refund. What can I ask you? Oh, I'm sorry. Please. Are you sure? Yeah, go ahead. So what I'm trying to figure out is once the — you know, given that the tax court had found the $2 million taxable income, when should the IRS have assessed ordinary income taxes on that payment? So let me just change the language of your question a little bit. When should they have adjusted the computation with respect to the Mercado loss? I think that's what Your Honor is asking. So the— They could have done it before the tax court obviously determined that the characterization of the $2 million— Well, they could have done it before that. They should have issued— How could it have assessed it? It's not an assessment, Your Honor. It's a computational adjustment, so it's purely computational. All it does is basically take the taxpayer's return, and let's make it, you know, fairly simple with numbers. I had a million-dollar loss from Mercado, okay? And now I'm going to recompute that return absent the million-dollar loss, and it's going to show me what the bottom line is, okay? That's what they should have done at the conclusion of the Mercado case. That flows into my question. Section 6214A says the tax court has jurisdiction to redetermine the correct amount of the deficiency. The Mercado proceeding had concluded by the time the commissioner filed the amended answer, and why wasn't that within the tax court's jurisdiction to reassess that and determine the correct deficiency? Because under 6230, there is no deficiency jurisdiction for a purely computational adjustment for a TEFRA item. But this was involved with the year in which there was a taxpayer-level determination about the trade or business. Well, generally, they all are going to be involved with the same year because the partnership item is going to be adjusted, and then the individual partner's return is going to have to be adjusted for that same year. So they all involved the same year. They also had the statute of limitations issue, right? In terms of assessing the tax? Yes. I was not involved in the case at that early stage, so I don't recall whether there was, but it is often the IRS does have a certain amount of time to make an assessment, and as I think Mr. Catterall pointed out, it is also often that the taxpayer and the IRS will enter into an extension agreement. But he said that, as I understood it anyway, that this particular configuration of deficiencies and issues kind of removed it from the eligibility for that kind of extension because of the pending self-employment tax issue. Maybe I misunderstood, but that's what I- No, a taxpayer and the commissioner can enter into an agreement to extend the period for assessment. It happens all the time. So that's what they should have done, and they should have still continued in the deficiency proceeding, or they did not- If the taxpayer and the commissioner enter into an extension, then there's no notice of deficiency issued until the commissioner figures out- Right. But when they don't enter into that and they're running up against the statute for assessment of tax, the IRS often just issues a notice of deficiency because it needs to get in under the wire, and then the taxpayer will file in tax court to redetermine that deficiency. But just getting back to the TEFRA issue, so 6230 restricts the deficiency jurisdiction of the tax court to only affected items, as Your Honor pointed out, which this is not, as the government agrees, and to non-partnership items. And this is neither of those. It's not an affected item because the tax court could easily make a determination with respect to the $2 million without any- without looking at the Mercado issue at all. Why is that? Because the question in that case is, is the $2 million includable in income? And if so, how is it includable in income? And whether the return is oversheltered or not oversheltered is irrelevant. It's either includable or it's not includable. As in- The result- Excuse me. As income, as opposed to a gift or some other thing? Well, that was- the tax court determined the characterization of the receipt of the funds, and it determined that it was income. So that- the characterization of that money, whether it was income, whether it was return of investment, whether it was a gift, the tax court can make that determination without any- without having to await for the Mercado decision. The fact that Mr. Che's return was oversheltered at that point is irrelevant because it's the result. The bottom line is going to ultimately be affected by the partnership case, but that's always the case. So then every item would be an affected item. So it's not an affected item, and it's clearly not a nonpartnership item. It was a partnership item, and the case- I'm saying it's not an affected item as income. Is that what you mean? Your opponent identified the $20 million also- or the $2 million. Sorry. Sorry for your client. And he said that the affected item was the losses and not the $2 million. Because the $2 million doesn't really have anything to do with Mercado. That's money coming out of Delta. The $2 million does not have anything to do with Mercado. That's exactly correct. An affected item- let me see if I can give you an example of what an affected item is. So let's say that a partnership sells a piece of property. And it has a certain basis in that property in which a gain is calculated. And now the individual partner has an outside basis in the property which mirrors the determination- mirrors the K-1. And he now reports his gain on that portion of whatever the item is that was sold. Now the commissioner comes in and he says, okay, we're going to challenge the basis in the property. Okay, so he has to do it in the partnership proceeding. Now the partner's gain, the individual partner's gain, is an affected item because it is directly affected by the determination of the TEFRA. Because now his basis is going to change, which changed the computation of gain or loss. That's an affected item. In this case, that $2 million that came from Delta, it could be determined whether it was income, a gift, return on investment, anything without reference to the Mercado result. Thank you. Can I just ask one more? So what's the bottom line here with regard to your client? Does he still face exposure with regard to the $2 million now that all the Mercado losses have been stripped out of his tax return? He does. Where does he face that? So the IRS issued a notice of deficiency with respect to the 2003 tax year based on the Mercado, the elimination of the Mercado loss. New notice of deficiency. New notice of deficiency. Mr. Che filed a tax court petition. And as I mentioned before, that's currently pending before the United States Tax Court. It's actually been calendared for trial twice. We've had it continued generally pending the outcome of this appeal. Could I ask the presider to ask for letters explaining the status of that proceeding? Certainly. If that's okay with the chair. Sure. Very good. We can provide a letter. If I could just. That's just 30 seconds. Okay. On the 6751B issue, what the government is trying to do is they're trying to transfer their burden onto Mr. Che, the taxpayer, to ask for the evidence which is part of their burden of production. And Mr. Catterall brought up there might be an issue of timing. Well, I don't really think there's an issue of timing because trial is the time. If there's no other time, it's at trial. You have to come forward with your evidence at trial. That's the last opportunity. So to suggest that we had to ask for it in discovery or at some other earlier time and that it was our burden to ask the government to produce their own evidence for which they actually have statutory burden of production makes no sense. Thank you, judges. Thank you. Two minutes. I'll do my best. On the jurisdictional issue, counsel has said that what the IRS should have done to apply the results of the Mercado proceeding to the taxpayer's return was through a computational adjustment. That's what the IRS did. When it did that, it couldn't take into account, it couldn't add back the $2 million because the taxability of that $2 million was actively being contested in the tax court. I mean, it's almost as if they're saying... In this proceeding or another? Yes, this proceeding. I mean, it's almost as if they're saying, you know, the additional deficiency is something like $560,000. It's almost like they're saying the IRS should have just assessed that. Can you imagine the hue and cry that would happen if the IRS just assesses income tax on a disputed $2 million payment? So, again, the question is, how does the IRS assert its claim? And it's exactly the way it did. It augmented its claim in the ongoing deficiency proceeding. And regarding this, yeah, there is the IRS filed or issued a protective notice of deficiency for 2003, you know, in case this case does not come out favorably. But my understanding is that there's all sorts of jurisdictional issues with that proceeding. I mean, I don't think it's as if, okay, if the IRS loses here, we win there. I don't think that's the case at all. I didn't have that impression. Okay. So unless there are any additional questions. Thank you both. You're very good arguments. The court will reserve decision. The final case is on submission. The clerk will adjourn court. Court is adjourned.